_____ FILED _____ RECEIVED
_____ ENTERED _____ SERVED ON
COUNSEL/PARTIES OF RECORD
OCT 23 2026
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: __________ DEPUTY

Jade Riley Burch
Plaintiff, Pro Se
222 Karen Avenue, Unit 1207
Las Vegas, NV 89109
Tel: (614) 725-9452
Email: jaderburch@gmail.com

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

**Jade Riley Burch,**

Plaintiff, Pro Se,

vs.

**Dignity Health,** a foreign nonprofit corporation, d/b/a **St. Rose Dominican Hospital, Siena Campus; CommonSpirit Health; Bobby Thomas, MD**, in his individual capacity; and **Does I through X**, inclusive

Defendants

**Case No.:** 2:26-cv-03474-APG-BNW

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiff Jade Riley Burch, appearing pro se, complains and alleges as follows.

**I. Nature of the action**

1. Plaintiff walked into Defendants' emergency department holding a notarized instrument she had executed seven days earlier. It designated an agent to speak for her and recorded what she would and would not accept. She handed it to Defendants' staff more than once. Within two hours of her arrival, Defendants' registration staff certified in writing, on an admission form Plaintiff signed as a competent adult, that she had no advance directive at all. The copies appearing in Defendants' produced electronic record bear a result and authentication time of 11:15 a.m. on July 24, 2026, fifty-seven minutes after the attending physician signed her discharge summary.

2. Nevada prescribes a specific instrument for taking a person in a mental health crisis into custody. Practitioners call it a Legal 2000. Defendants' own systems classified Plaintiff under

that designation, and the abbreviation "L2K" printed on her meal receipts at every meal for the length of the stay. Staff told Plaintiff, and told her designated agent in her presence, that she was "on a legal hold." The instrument was never completed. No crisis-hold form appears anywhere in the records produced to Plaintiff, no certificate, no petition, no court order. The attending physician documented that no medical hold was needed. Defendants gave Plaintiff the label without the law and restrained her as though the label were true.

3. Plaintiff came in voluntarily and twice asked to be admitted voluntarily. She was competent for every hour of the three days. Defendants held her three calendar days in a glass-walled emergency department room because no psychiatric facility would take her. They placed her on continuous one-to-one observation, confined her to a bed, escorted her to the restroom, denied her eating utensils, sent her agent out of the building carrying everything Plaintiff had brought, and left her in two hospital gowns with nothing underneath. In response to reported seizure activity, Defendants administered intravenous lorazepam on multiple occasions, including administrations Plaintiff recalls occurring while she was conscious, alert, and expressly refusing the drug, and they withheld the supplemental oxygen and the balance of her documented protocol. They threatened to cut the safety device from her wrist while documenting that a different locked item she wore need not be disturbed. Plaintiff is a transgender woman. Defendants recorded her sex correctly through the second day, changed it mid-admission at a timestamp their own laboratory system preserved, and let the change rewrite the reference ranges against which her blood work is read.

## II. Parties

4. Plaintiff Jade Riley Burch is a natural person and a resident of Clark County, Nevada.

5. Defendant **Dignity Health** is a foreign nonprofit corporation registered to do business in Nevada, NV Business ID No. NV20021193622, Entity No. C268-2002, doing business in Clark County as St. Rose Dominican Hospital, Siena Campus, 3001 St. Rose Parkway, Henderson, Nevada 89052 (the "Hospital"). The Hospital's operations affect commerce. It is a place of public accommodation under 42 U.S.C. § 12181(7)(F), which enumerates a "professional office of a health care provider" and a "hospital." The Hospital receives federal financial assistance, including Medicaid reimbursement. Defendants' registration records identify Plaintiff's coverage as Medicaid, listing "BCBS MEDICAID" with group number "NVMCD000."

6. Defendant **CommonSpirit Health** is a nonprofit health system formed February 1, 2019 through the combination of Dignity Health and Catholic Health Initiatives. Dignity Health operates as part of CommonSpirit Health, and the Hospital holds itself out as a Dignity Health, St. Rose Dominican facility. CommonSpirit Health is principally engaged in the business of providing health care and receives federal financial assistance, including Medicaid reimbursement. Plaintiff does not rest CommonSpirit Health's presence in this action on ownership of the Hospital. She pleads three propositions. First, CommonSpirit Health maintains a management structure of its own directed at Nevada hospital operations. Its published leadership roster states that Katherine Vergos "is the president of CommonSpirit Health's Las Vegas market, which includes St. Rose Dominican Hospital, St. Rose Dominican Hospital-San Martin Campus and St. Rose Dominican Hospital-Rose de Lima Campus." The first entity named is, on information and belief, the Siena campus at which Plaintiff was treated. That statement is CommonSpirit Health's own, and it describes an officer CommonSpirit Health designated, holding a CommonSpirit Health title, whose assigned portfolio is three Nevada hospitals. On information and belief, a divisional layer sits above that market, CommonSpirit Health having named Tim Bricker president of its Southwest

Division, encompassing the Dignity Health facilities in Arizona and Nevada. Second, on information and belief, CommonSpirit Health designed, maintained, or controlled the specific instrumentalities that injured Plaintiff: the electronic health record in which her sex designation was changed and her laboratory reference ranges rewritten, the standardized admission instruments on which her directive was certified not to exist, the document-management process that returned her directive with a result time later than her own discharge summary, and the behavioral-health, advance-directive, visitation, suicide-precaution, and patient-identity policies applied to her. Third, her injuries arose from the operation of those systems at a Nevada hospital. The chart entries for "Birth Sex" and "Sex Representation" bear the author designation "CommonSpirit." Plaintiff does not contend that the designation alone identifies the person or automated process responsible for any entry; she alleges it, with the shared record architecture and the uniform instruments applied to her, supplies a factual basis for the second proposition. The extent of CommonSpirit Health's authority over those systems lies within its exclusive knowledge, and Plaintiff reserves the right to seek jurisdictional discovery. In every Count naming the entity Defendants, CommonSpirit Health's liability is pleaded first on the direct theory and alternatively on actual or ostensible agency. No Count depends upon the agency theory.

7. Defendant **Bobby Thomas, MD** is a physician licensed to practice medicine in Nevada, license no. 21293, who at all relevant times practiced at the Hospital and served as Plaintiff's admitting and attending hospitalist during the July 22 through 24, 2026 admission. Defendants' records identify him as admitting and attending physician, reflect that he admitted Plaintiff to observation status, evaluated her July 23, authored the admission history and physical and the discharge summary, and documented that "[n]o medical hold [was] needed." His admission plan directed "Ativan IV for active seizure," and the standing intravenous lorazepam order issued

within his admission order set. He continued Plaintiff's confinement through July 24 after documenting that no medical hold was needed, and signed the discharge summary recording her sex as male. The emergency department record identifies him as "of reliant covering," reflecting, on information and belief, practice with a contracted hospitalist group. Whether employee or contractor, he attended Plaintiff as the hospitalist the Hospital assigned to her, and the entity Defendants are liable for his conduct under actual or ostensible agency.[1] He is sued in his individual capacity and as an agent of the entity Defendants.

8. Defendants **Does I through X** are the additional physicians, nurses, administrators, registration personnel, and other staff who participated in the conduct alleged, including those who certified that Plaintiff had no advance directive, entered the observation and suicide-precaution orders, announced the intended petition, told Plaintiff she was on a legal hold, imposed and enforced the confinement, ordered and administered lorazepam through her implanted port, escalated her psychotropic doses, excluded her agent, compelled removal of her safety device, denied her access to counsel, handled the scanning and routing of her instrument, and altered her sex designation. Their true names are presently unknown or their roles remain to be confirmed. Among them, on information and belief, is the registration employee identified in Defendants' admission records as "Thompson, Tameka - SRDH." Plaintiff will amend to state their true names and roles when ascertained. Each is, on information and belief, an agent, employee, or contractor

---

[1]An employer is vicariously liable for an employee's intentional tort committed in the course of the very task assigned. *Prell Hotel Corp. v. Antonacci*, 469 P.2d 399, 400 (Nev. 1970); see *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1180 (Nev. 1996). A hospital may also be liable for an attending physician's acts, including an independent contractor's, under ostensible agency. Whether such agency exists is ordinarily a question of fact turning on whether the patient entrusted herself to the hospital, whether the hospital selected the physician, whether the patient reasonably believed he was the hospital's agent, and whether she was put on notice of independent-contractor status. *Schlotfeldt v. Charter Hosp. of Las Vegas*, 910 P.2d 271, 275 (Nev. 1996).

acting within the course and scope of that engagement, such that the entity Defendants are vicariously liable for their conduct.

**III. Jurisdiction and venue**

9. This Court has federal question jurisdiction under 28 U.S.C. § 1331 over Counts VIII through XII, which arise under Title III of the Americans with Disabilities Act, 42 U.S.C. §§ 12181 et seq.; the ADA's anti-retaliation provision, 42 U.S.C. § 12203; Section 504 of the Rehabilitation Act, 29 U.S.C. § 794; and Section 1557 of the Affordable Care Act, 42 U.S.C. § 18116. Each Count independently supports jurisdiction.

10. No administrative exhaustion is required. Title III supplies a private right of action on the terms of 42 U.S.C. § 2000a-3(a) and conditions it on no administrative filing. 42 U.S.C. § 12188(a)(1). Section 504 imposes no exhaustion requirement on a claim against a recipient of federal financial assistance. Section 1557 makes available the enforcement mechanisms of the statutes it incorporates, 42 U.S.C. § 18116(a), none of which conditions a private action against such a recipient on exhaustion.

11. This Court has supplemental jurisdiction under 28 U.S.C. § 1367(a) over Counts I through VII. Those Counts arise from the same admission, the same instrument, and the same restrictions as the federal Counts, derive from a common nucleus of operative fact, and form part of the same case or controversy under Article III. *United Mine Workers v. Gibbs*, 383 U.S. 715, 725 (1966).

12. Supplemental jurisdiction likewise reaches the claims against Dr. Thomas and the Doe Defendants, who are named only in the state-law Counts. Section 1367(a) provides that supplemental jurisdiction "shall include claims that involve the joinder or intervention of additional parties." The conduct pleaded against those Defendants is the conduct underlying the

federal Counts: Dr. Thomas entered the order set containing the standing lorazepam order, documented that no medical hold was needed and continued the confinement regardless, ordered the dose escalation, and signed the discharge summary recording Plaintiff's sex as male. The Doe Defendants certified that no directive existed, imposed and enforced the restrictions, administered the lorazepam, and excluded Plaintiff's agent. Those are the operative facts of Counts VIII through XII, and separate proceedings would require two courts to resolve the same questions on the same evidence. The limitations in 28 U.S.C. § 1367(b) do not apply, as they reach only actions in which original jurisdiction is founded solely on 28 U.S.C. § 1332.

13. Venue is proper under 28 U.S.C. § 1391(b)(2). A substantial part of the events giving rise to Plaintiff's claims occurred in this District, the Hospital is located in Henderson, Clark County, Nevada, and Defendants are subject to this Court's personal jurisdiction.

## IV. Factual allegations

### A. The instrument

14. On July 15, 2026, Plaintiff executed a written instrument captioned Psychiatric Advance Directive (the "Directive"). She executed it while competent and acknowledged her signature before a Nevada notary public, whose certificate states that Plaintiff "executed the same freely and voluntarily for the purposes therein contained" and "appeared to be of sound mind at the time of execution." Porscha Ryan executed an acknowledgment within the instrument accepting the responsibilities it assigns her.

15. The instrument does three things at once. It designates an agent to make health care decisions, which Nevada governs as a durable power of attorney for health care under NRS 162A.700 to 162A.870. Section 1 states that "[t]his designation is a Durable Medical Power of Attorney pursuant to Nevada law," and that the agent's "authority survives and remains in full

force during any period of incapacity." It records Plaintiff's instructions and preferences regarding psychiatric care, which Nevada governs under NRS 449A.600 to 449A.645. And it put Defendants on written notice, before any decision had to be made, of what a competent Plaintiff would refuse. Plaintiff pleads the statutory character and legal effect of the instrument in the alternative. Independently of that characterization, the instrument provided written notice of her instructions, refusals, designated agent, and requested accommodations.

16. The instrument designates Ms. Ryan as Plaintiff's agent and designated advocate, assigning her responsibilities concerning placement, sedation and restraint, visitation and physical presence, and access to records. It identifies Plaintiff as a transgender woman and directs that she be addressed by her name, Jade, and by she/her pronouns. It documents her seizure disorder and directs that supplemental oxygen be available for seizure activity. Its lorazepam provisions are specific: the drug is permitted for "[a]cute anxiety, panic, or seizure rescue only," and "NOT for behavioral control, restraint, or sedation"; the dose is capped absolutely, "Max dose: 1 mg single dose. No exceptions"; "[n]o repeat or split dosing" is permitted "without explicit DPOA authorization"; seizure-rescue use must "document observed seizure activity"; "DPOA notification [is] required for ANY Ativan administration"; and any administration "outside these parameters constitutes NON-CONSENSUAL CHEMICAL RESTRAINT." Plaintiff sought those conditions for a clinical reason within her own knowledge: a single lorazepam dose of 2 mg or more produces anterograde amnesia in her, and prior administrations at or above that dose have cost her memories she has not recovered. The instrument sets its ceiling one step below that dose and guards the same margin by treating "0.5+0.5" as repeat dosing. It prohibits any antipsychotic other than Abilify 5 mg daily without Ms. Ryan's authorization, and directs that the dose not be increased nor another substituted without consulting her. It requires verification of Plaintiff's

medication list with her prescribing pharmacy before any medication is administered. It protects her access to counsel, the courts, and the devices needed to meet active litigation deadlines, and offers one-to-one observation as the accommodation answering any facility security concern, stating that patient-requested observation "is a level of care, not a restriction." It provides that Plaintiff's locking GPS safety device may be removed only on Ms. Ryan's authorization, that she holds the key, that staff must notify her before any medically necessary removal, and that she reapply it before Plaintiff leaves the facility. It requires that significant deviations be reported to facility Risk Management, and it sets the discharge protections detailed below.

17. The instrument was in Plaintiff's possession at admission, and she personally handed it to Defendants' staff on more than one occasion. Staff received and examined it. One nurse, having looked it over, asked Plaintiff whether she had "downloaded this from the internet," and later asked whether Plaintiff was trying to scare them. Within days of discharge, Plaintiff recounted that exchange in a text message to her outpatient psychiatrist's office.

**B. Defendants certify in writing that no directive exists**

18. A copy of the instrument does appear in the records Defendants later made available, including the health summary Plaintiff obtained through Defendants' patient portal before filing, in two separate scanned document sets, one indexed "Outside Records" and one indexed "Advance Directive." Each bears a result date of July 24, 2026 at 11:15 a.m., is attributed to "Documents CPDI," and carries a result status of "authenticated." July 24 was the last day of the admission. Dr. Thomas had signed the discharge summary at 10:18 a.m., fifty-seven minutes earlier. The same 11:15 a.m. batch captured Plaintiff's discharge instructions and scanned consent forms, the paperwork generated at the end of the stay. Defendants did not lack notice of the instrument. The timing and handling of its receipt, scanning, indexing, routing, availability, and

review, and the identity of every person who accessed it, remain recorded in Defendants' document-management and electronic health record audit trails and within Defendants' exclusive knowledge and control.

19. Defendants did more than delay incorporation. They affirmatively documented that no directive existed. Plaintiff arrived at approximately 3:31 p.m. on July 22. Less than two hours later, Defendants' registration staff completed the Conditions of Admission instruments Plaintiff signed as a competent adult. Those instruments contain a block captioned "For Hospital Use Only: Compliance with Advance Directive Policies," which is Defendants' compliance instrument for the federal obligation, imposed on them as Medicaid participants, "to document in a prominent part of the individual's current medical record whether or not the individual has executed an advance directive." 42 U.S.C. § 1396a(w)(1)(B); accord 42 U.S.C. § 1395cc(f)(1)(B). On the completed forms, the checked box states that "[t]he Patient does not have a written advance directive about health care decisions," with the sub-box indicating the patient "[d]oes not wish further information now." The boxes indicating that the patient has a written directive, and that a copy has been given to the Hospital, are blank. The entries bear the initials "TT-" and were completed at 5:07 p.m. and 5:08 p.m., and the four admission instruments carry digital signature stamps between 5:08:04 and 5:10:02 p.m. The Admitting Acknowledgement Form bears the witness signature "Thompson, Tameka - SRDH." Completing that field called for no clinical judgment. It called for looking at the document Plaintiff had handed over. Defendants' registration records then recorded three mutually inconsistent advance-directive states within fourteen hours: the 3:31 p.m. face sheet leaves the "ADV DIR" field blank; the Conditions of Admission certify that no written directive exists; and the face sheet generated at 5:52 a.m. on July 23 reads "ADV DIR: 2 COPY NOT OBTAINED." Not one is accurate.

**C. She came in voluntarily and asked to be admitted voluntarily**

20. Plaintiff presented on July 22, 2026 on referral from her outpatient psychiatric provider in connection with reported suicidal ideation. Ms. Ryan drove her, and Plaintiff walked in under her own power. No law enforcement officer brought her, no emergency transport delivered her, and no legal process compelled her. Defendants' triage entry records "Mode of Arrival: Ambulatory" and describes her as "AMBULATORY WITH STEADY GAIT, A&OX 4." Defendants' physician examination records her as "Well-appearing, no acute distress" and "Awake, alert, cooperative, mental status appropriate for age." Ms. Ryan remained through intake and witnessed the events described below until Defendants required her to leave.

21. Plaintiff's referring provider, a physician assistant identified in Defendants' records as "Samantha Roth, PAC," telephoned the emergency department at 3:40 p.m. to provide history and explain that placement had been sought and had failed. A physician assistant is among the persons NRS 433A.160 authorizes to place a person in a mental health crisis on a crisis hold. Ms. Roth placed none. Plaintiff arrived under no hold, no certificate, and no application for emergency admission.

22. Plaintiff was competent, oriented, and communicating for the entire admission, and Defendants' records so reflect at every point they touch the question. Registration staff had her execute binding admission instruments as a competent adult. The produced records contain no capacity assessment, no finding of incapacity, and no documentation that any provider questioned her capacity. Every refusal she made was made in words, contemporaneously, to staff who heard her.

23. Plaintiff twice told staff she wished to be admitted voluntarily. Defendants' own records use the same term, recording that staff had been "unsuccessful at obtaining placement for

voluntary hold in psychiatric facility." Promptly after release, Plaintiff described her circumstances in writing to her outpatient psychiatrist's office, using Defendants' own shorthand for an emergency psychiatric hold and stating that she had asked twice to be admitted voluntarily. Plaintiff does not disclaim the measures her instrument requested, and identifies them so that what Defendants imposed beyond them is plain. The instrument offered one-to-one observation as her "preferred baseline level of care" during "any voluntary psychiatric admission," stated that patient-requested observation "is a level of care, not a restriction," and directed that staff "shall not treat my request for this observation level as clinical evidence of elevated acuity." It permitted soft physical restraint only where the patient "verbally requests" it or her agent "explicitly authorizes" it, and permitted lorazepam on the conditions set out in paragraph 16. Every consent carried a condition on the face of the instrument, and Defendants honored none. Plaintiff was never admitted to any psychiatric facility. She never requested restraint and Ms. Ryan never authorized it. Each consent presupposed that her agent would be present, that her safety device would stay on her wrist, and that her devices and case files would remain available to her. Defendants imposed one-to-one observation as a suicide precaution under an asserted legal hold, confined her to a bed, escorted her to the toilet, took her clothing and her property, put her agent out of the building, and compelled removal of her device. She consented to being watched. She did not consent to being held.

**D. The announced petition and the hold that was never completed**

24. On July 22, before any physician had evaluated Plaintiff and before any examining professional had certified anything, a nurse told her she was "starting the petition." When Plaintiff objected and invoked her instrument, the nurse responded that the facility "always" does so. Ms.

Ryan received no notice that a petition was being prepared, and no clinical findings were communicated to her.

25. Defendants told Plaintiff she was "on a legal hold." They told Ms. Ryan the same thing in Plaintiff's presence. Plaintiff believed it, and believing it, understood that any request to leave would be futile and that an attempt to leave would be met with restraint or escalation of the threatened commitment process.

26. Defendants did not confine that representation to speech. Throughout the admission, the meal receipts delivered with Plaintiff's food carried the designation "L2K," the working shorthand in Nevada practice for a Legal 2000, the instrument by which a person in a mental health crisis is placed into custody under NRS 433A.160. The designation appeared at every meal for the length of the stay, on documents Defendants' own dietary and bed-management systems generated, and on information and belief the classification was entered into Defendants' operational systems and remained there through discharge. Plaintiff did not guess at its meaning. She had been placed on an actual Legal 2000 hold at an unaffiliated Nevada facility in 2023. Defendants' own network had also applied the classification to her five days earlier: the record of her July 17, 2026 encounter at Defendants' San Martin campus states that she "will be placed in L2K for further psychiatric evaluation." That earlier use establishes that "L2K" is a live operative classification within Defendants' systems rather than an idle abbreviation.

27. No completed instrument required to place Plaintiff on a mental health crisis hold appears anywhere in the records Defendants have produced or otherwise made available. Neither does any certificate under NRS 433A.170, any petition for court-ordered admission, or any order of any court. Dr. Thomas documented in the admission history and physical that "[n]o medical hold [was] needed." On information and belief, no crisis hold was ever completed and Plaintiff

was never lawfully detained. Defendants classified Plaintiff under Nevada's custodial category, told her she occupied it, printed it on her meals, and restrained her as though it were true, without completing the form that would have made it true or affording her the process that would have followed from it.

**E. The agent is put out, carrying everything Plaintiff owned**

28. The instrument designates Ms. Ryan as Plaintiff's agent and directs that she be afforded access to Plaintiff and her records and be physically present as much as possible. Ms. Ryan was also an eyewitness to the events occurring in her presence before Defendants excluded her. Defendants' records list her as Plaintiff's emergency and primary contact, with her telephone number, and separately list her as a care-team related person in an entry dated May 29, 2026.

29. Ms. Ryan drove Plaintiff to the Hospital and remained through intake. Defendants then required her to leave and sent Plaintiff's belongings out of the building in her hands. From that point Defendants denied her the physical presence and access the instrument reserved to her. They had her contact information and used it when it suited them, telephoning her during the admission about an attempted transfer. They did not use it to give notice of the threatened petition, to notify her of any lorazepam administration, or to notify her before discharge. Nevada law guarantees a patient the right to "[r]eceive, within reasonable restrictions as to time and place, visitors of the patient's choosing, including, without limitation, friends and members of the patient's family." NRS 449A.106(9). Defendants imposed no reasonable restriction as to time or place. They imposed exclusion. They then compelled removal of the device described below, which was the one channel through which Ms. Ryan could reach Plaintiff directly once she was outside the building.

**F. The conditions of confinement**

30. At 3:49 p.m. on July 22, eighteen minutes after Plaintiff walked in, Defendants entered orders for "One to One Observation" with "Suicide Precautions," "Suicide Precautions" per facility policy, and "Consult to Mental Health." No physician had yet examined her.

31. Plaintiff never left the emergency department. Defendants' July 23 face sheet assigns her to room and bed "EDIP EMDS12," and both the history and physical and the discharge summary record her location as "SRS EDIP: EMDS: 12." She was held in a glass-walled room, visible to staff and passersby, for the duration. Defendants' records state that outside facilities "won't take her because of her chronic medical problems," and Defendants attempted transfer to one or more receiving psychiatric facilities, including North Vista Hospital, each of which declined. Plaintiff was never admitted to a psychiatric unit.

32. Defendants placed Plaintiff in observation status. At 7:07 p.m. on July 22, they entered a patient-placement order reading "Observation Services, Reason: SI, Medical/Surgical, 0-1 days - < 2 midnights anticipated." In the same order set at the same time, they entered a nursing communication instructing staff to update Plaintiff's preferred pharmacy because of an "anticipated discharge today." Defendants' own order set contemplated a stay materially shorter than the one they imposed. Plaintiff was held through two midnights and into a third calendar day. The produced records identify no order extending the stay.

33. Plaintiff arrived carrying a backpack holding her clothing, laptop computer, cellular phone, chargers, and personal effects. Defendants required that all of it leave the building, and it left in Ms. Ryan's hands at the moment Defendants required her to go. Defendants' own discharge documentation records that "[a]ll clothes, cellphone, wallet, keys, and jewlery was sent home with family at admission." Plaintiff was left with nothing. She spent the admission in hospital gowns,

one worn forward and one worn backward for coverage, with nothing underneath. Defendants made no provision for clothing at any point during the three days. The single act that stripped Plaintiff of her property also removed the advocate her instrument designates to speak for her.

34. Defendants gave Plaintiff no eating utensils, and her meals arrived on paper trays. Staff once delivered plastic utensils and retrieved them shortly afterward, telling Plaintiff she was not allowed to have them. She was confined to her bed, not permitted to move about the unit, and escorted to the restroom and back. She could not use the toilet without a guard present. Defendants' own order set of July 22 includes orders to "Ambulate" and to "Advance Activity as Tolerated." Neither was honored.

35. Plaintiff is a party to active federal litigation, including matters in this District. Prosecuting those matters requires her case files, the ability to draft and transmit documents, and communication with the court and opposing parties. Her instrument documents that litigation, requires continuous access to her laptop, phone, chargers, case files, and email during any admission, and offers one-to-one observation as the accommodation neutralizing any facility security concern. Defendants sent her laptop and phone out at admission and permitted her no device of any kind for the remainder of the stay. When Plaintiff told staff they were obstructing her litigation, staff answered that the Hospital had telephones. Defendants permitted no pen or other writing implement, notwithstanding the continuous one-to-one observation already in place. Early in the admission Plaintiff asked to speak with the Hospital's legal counsel and was told the Hospital did not have legal counsel. She asked for Risk Management and was told Risk Management was not there. Ms. Ryan heard both responses. Nevada law requires a hospital to provide each patient, upon admission, contact information for the persons to whom complaints may be expressed, including a patient representative or social worker, the Bureau for Hospital

Patients disclosure prescribed by NRS 232.462, and contact information for entities investigating patient abuse or neglect. NRS 449A.118(3)(b), (e), (f). No one connected Plaintiff with counsel, with Risk Management, or with any patient advocate.

**G. The seizures and the lorazepam**

36. Plaintiff has a documented, medication-resistant seizure disorder appearing throughout Defendants' own problem list. Defendants' records recount that she had a seizure on the day of presentation "consistent with her prior seizures." Defendants entered a standing order reading "LORazepam: 1 mg, IV Push, q4hr, PRN: Seizures," authorizing intravenous administration every four hours as needed. That order contains no limitation matching any condition stated in the instrument. Dr. Thomas's admission plan directs "Ativan IV for active seizure." Plaintiff has an implanted port, placed May 18, 2026 in the right internal jugular, used for scheduled saline infusions managing her dysautonomia. Accessing it requires a needle stick through the skin into the port body.

37. Plaintiff seized during the admission. Hospital personnel administered intravenous lorazepam through her implanted port on what she recollects to be at least three occasions, each dose 1 mg to her knowledge. Each individual dose was therefore within the instrument's absolute single-dose ceiling. The violations lie elsewhere. The instrument permits no repeat or split dosing without Ms. Ryan's explicit authorization. She authorized none, and Defendants never asked her, because they never notified her that any dose had been given at all. Two of the three administrations were accordingly repeat doses given without the authorization the instrument requires. The instrument further permits lorazepam only for acute anxiety, panic, or seizure rescue, never for sedation, and requires that seizure-rescue use document observed seizure activity. Each administration Plaintiff recalls occurred while she was conscious, alert, and not then seizing.

Plaintiff's recollection of portions of the admission is incomplete. The number, timing, dose, route, and documented indication of each administration, and the identity of the person who entered the order and of each person who administered a dose, are fixed in Defendants' medication administration record and within Defendants' exclusive knowledge and control.

38. No Defendant sought or obtained Plaintiff's contemporaneous consent to any administration. She refused each one she recalls, in words, to the staff member performing it. Ms. Ryan was never notified. No supplemental oxygen was provided. No other element of the seizure protocol was followed. Sedation was the whole of Defendants' response. The produced records contain no documentation of any emergency override of the instrument's conditions, which it requires the attending physician to complete within thirty minutes when such an override is claimed. When Plaintiff reported a seizure to Dr. Thomas, he recorded that she "[h]ad seizure several minutes prior to my arrival per patient but no post-ictal state note, no tongue biting or incontinence," and took no responsive action.

**H. Medication handling**

39. The instrument requires that Plaintiff's medication list be verified with her prescribing pharmacy before any medication is administered. The produced records contain a single pharmacy note, dated July 23, addressing apixaban alone. No pharmacy verification of Plaintiff's broader medication list appears anywhere. Defendants also tripled Plaintiff's antipsychotic dose during the admission and sent her home on the elevated dose. Defendants' emergency department note of July 22 records her home medication as "Abilify, 5 mg, PO, qDay." The instrument in Defendants' possession permits that medication at that dose and directs that the dose not be increased without consultation with Ms. Ryan. Defendants' chart thereafter reflects "ARIPiprazole 15 mg oral tablet" carrying a start date of July 22, entered during the admission

and recorded as a home medication. Dr. Thomas ordered "ARIPiprazole, 15 mg, PO, Tab, qDay" to begin at 9:00 a.m. on July 24, and the discharge medication list continues aripiprazole at 15 mg daily. The same pattern appears with sertraline, recorded on the July 22 home list at 25 mg daily, on the July 23 home list at 50 mg daily, and discharged at 50 mg daily. Neither escalation was discussed with Plaintiff or with Ms. Ryan. The discharge medication list also departs from the instrument's lorazepam ceiling: item 20 reads "LORazepam(LORazepam 1 mg oral tablet) 1 to 2 tab By mouth Tab once daily as needed for anxiety," authorizing a single administration of up to 2 mg against an instrument stating "Max dose: 1 mg single dose. No exceptions." That authorization permits twice the maximum the instrument allows, and permits the precise dose at which Plaintiff loses memory. Plaintiff pleads it as evidence of Defendants' disregard of the instrument in their possession.

40. Defendants' records identify Plaintiff's scheduled intravenous hydration among the medical needs affecting her placement in a medical bed rather than a psychiatric facility. Defendants' own records set that protocol as intravenous sodium chloride "every Tuesday, Thursday, and Saturday." Plaintiff's confinement spanned Wednesday July 22 through Friday July 24 and therefore included a scheduled Thursday session. On information and belief, and on the face of the produced records, Defendants administered no infusion at any point during the admission. Defendants held Plaintiff for a capability they never used.

**I. The safety device**

41. Plaintiff wears an AngelSense GPS safety watch on her wrist. The device is a monitor, not a restraint, and does not restrict movement. It is worn on a locking silicone strap removable only with a magnetic barrel key. It guards against a documented elopement risk arising from Plaintiff's dissociative condition, which Defendants' own problem list records as confirmed

and active. It is also the communication link between Plaintiff and her designated agent: Ms. Ryan can call the device directly and it answers automatically, without any action by Plaintiff, and Plaintiff can summon Ms. Ryan by pressing a single button. It permits no outgoing calls to anyone else.

42. Defendants' nursing staff demanded that the device come off and stated they would cut it from Plaintiff's wrist if a key could not be produced. The threat was made by staff standing over a patient they had told was legally detained, and it was a threat to bring a cutting instrument to her wrist. Ms. Ryan, who was present, did not have her key with her. Plaintiff carries an emergency key, and that key was used to unlock the strap so the device would not be destroyed. Had Plaintiff not been carrying it that day, Defendants would have cut the device off her wrist.

43. Plaintiff objected. Neither Plaintiff nor Ms. Ryan gave the authorization the instrument contemplates. What Defendants obtained was compliance extracted by a threat to destroy the device, from a patient they had told was legally detained. That is submission, not authorization. Removal ended the elopement safeguard the device existed to provide and severed the direct line between Plaintiff and the agent Defendants were in the course of putting out of the building. The device left with Ms. Ryan, along with everything else Plaintiff had brought. Defendants' own records confirm that a locked item was no obstacle when they chose to accommodate one: their discharge documentation records that Plaintiff "has pair of earings in her ear at bedside that cannot be removed due to locks," and notes that a nurse "is aware." Defendants documented that item, left it in place, and required nothing of Plaintiff with respect to it. The distinction was not about locks.

**J. The observation notice**

44. At 7:25 p.m. on July 22, roughly three and a half hours after entering the observation and suicide-precaution orders and after staff had told Plaintiff she was on a legal hold, Defendants presented her with a Medicare Outpatient Observation Notice stating that her physician "has placed you into our hospital as an Outpatient" and that "[y]ou have not been admitted as an Inpatient even though you are in a hospital bed." That notice is a billing-status disclosure. It arrived after the custodial restrictions were in place and corrected nothing staff had told her. Plaintiff does not allege that Defendants formally admitted her on an involuntary basis. She alleges the opposite: Defendants told her she was in legal custody when no instrument conferring custody existed, then restricted her as though one did. Defendants' records are inconsistent on status as well. The notice advised Plaintiff she was not an inpatient; the discharge summary recites that she was seen by psychiatry "while inpatient," and the discharge packet is captioned "Inpatient Discharge Instructions."

**K. The psychiatric consultation**

45. At 3:49 p.m. on July 22, Defendants ordered a "Consult to Mental Health." The consultation occurred on the evening of July 23, conducted remotely by video by an off-site psychiatrist rather than by any clinician who examined Plaintiff in person. Defendants' discharge instructions identify "Borenstein, Yehonatan MD" as Consulting Physician, and the discharge summary asserts that Plaintiff was "seen and evaluated by Psychiatry while inpatient" and "[c]leared for discharge home." No psychiatric consultation note, no consultant's findings, no certification, and no timestamp for that consultation appears anywhere in the produced records. On information and belief, the consultant's records reside with a telepsychiatry contractor rather than in the Hospital's chart. A psychiatric consultation is not a mental health crisis hold. It

produced no hold instrument, no certification, and no petition, and by Defendants' own account it culminated in clearance for discharge home.

46. Defendants continued Plaintiff's confinement after that clearance, through the night of July 23 and into the following morning. By then the attending physician had documented that no medical hold was needed, Plaintiff had denied suicidal ideation, and psychiatry had cleared her to go home. Whatever justification Defendants claim for the earlier period, none survived into the last.

**L. The discharge**

47. Defendants discharged Plaintiff on July 24, 2026 with a discharge diagnosis of "SI, resolved," without any completed petition or hearing. Dr. Thomas signed the discharge summary at 10:18 a.m.

48. Section 11 of the instrument sets discharge protections: no discharge without notification to Ms. Ryan and her acknowledgment, with a minimum of four hours' advance notice; confirmation of safe, arranged transportation before discharge; prescriptions or a 72-hour supply of medications with written follow-up instructions, and bridge medications if a pharmacy cannot fill immediately; and reapplication of the safety device by Ms. Ryan before Plaintiff leaves the facility. Defendants honored none of them. They gave Ms. Ryan no advance notice and obtained no acknowledgment; the only notice she received was a telephone call Plaintiff placed after Defendants told her she was being released. Defendants arranged and confirmed no transportation. They provided no prescriptions, no 72-hour supply, no bridge medications, and no written follow-up instructions. Their own discharge packet corroborates the omission: it lists Plaintiff's medications under the heading "Unchanged" and contains no prescription, no dispensing record, and no supply. Having sent Plaintiff's backpack out at admission, Defendants made no provision

for anything for her to wear, and she left dressed only because Ms. Ryan brought back the same clothing Defendants had made her surrender. Plaintiff left without her safety device on her wrist. Reapplication required Ms. Ryan's presence at the facility, and Defendants had spent the admission denying her precisely that access, making performance impossible by their own doing. Ms. Ryan reapplied the device after they reached home.

**M. The sex designation**

49. Defendants recorded Plaintiff's sex correctly through two full days of care. The emergency department physician note of July 22 and the history and physical of July 23 each record her sex as "F." Defendants' registration face sheets of July 22 and July 23, both versions of the observation notice, and the pharmacy note of July 23 likewise record her as female.

50. Defendants' own laboratory system timestamps the change. Result comments appended throughout Plaintiff's chemistry and hematology panels state: "Reference range changed due to change in patient's sex at JUL/23/26 17:28:32," and, on a second panel, "at JUL/23/26 17:28:39." The change occurred at 5:28 p.m. on July 23, 2026, in the middle of the admission, and it immediately rewrote the reference ranges against which her results are read. On her creatinine, the normal low moved from .57 to .72 and the normal high from 1.11 to 1.25. On her hemoglobin, the range moved from 11.5 through 16.0 to 12.5 through 17.5. On her hematocrit, from 34.0 through 47.0 to 35.0 through 50.0. On her ALT, the normal high moved from 34 to 45. On her BUN, from 10.0 through 26.0 to 9.0 through 21.0. Values that had been reported against one baseline were re-reported against another, mid-admission, by operation of the changed field.

51. The change then propagated. The discharge summary of July 24 records "Sex: M." Defendants' Social History entries for "Birth Sex" and "Sex Representation," each bearing the author designation "CommonSpirit," were last modified at 6:33 p.m. on July 24, hours after Dr.

Thomas signed the discharge summary at 10:18 a.m. The "Sex Representation" entry records "Male (finding)." The continuity-of-care documents Defendants generated catalogue Plaintiff's "Admin Sex" as "Male," while the clinical narratives reproduced inside those same documents describe her throughout as "47F." Plaintiff does not presently know whether a person or an automated rule changed the field. The identity of the user or rule, the prior and new values, and the timestamp are recorded in Defendants' audit trail and within Defendants' exclusive knowledge and control.

**N. Warnings, injury, recurrence, and policy**

52. Plaintiff did not suffer this admission in silence. She handed Defendants her instrument more than once. She told staff their conduct violated it. She asked for the Hospital's legal department and for Risk Management and was told neither was available. She asked twice to be admitted voluntarily. She objected to the lorazepam. She objected to removal of her safety device. Defendants disregarded every one of those communications. Her assertion of her rights, which the instrument expressly provides is "the exercise of protected patient rights, not evidence of psychiatric instability, agitation, or noncompliance," was met by a staff member asking whether she was trying to scare them.

53. Plaintiff was deprived of her liberty across three calendar days and two nights under the conditions described above. She suffered and continues to suffer humiliation, fear, anxiety, exacerbation of her documented psychiatric and neurological conditions, loss of trust in medical care, and interference with her ability to prosecute her pending litigation. She sustained economic loss as well, including the loss of clothing and personal property sent out of the building and not returned, transportation costs occasioned by a discharge for which Defendants arranged nothing,

and the cost of replacing the medication supply Defendants failed to provide, in amounts to be proven at trial.

54. The threat that Defendants will repeat this conduct is real and immediate, not conjectural. Plaintiff resides in Clark County and has chronic psychiatric, neurological, and autonomic conditions requiring continuing medical care. She presently requires scheduled intravenous saline infusions three times each week through an implanted port. Although administered outside a hospital, port-access complications her outpatient provider will not manage, including a compromised dressing or partially dislodged needle, can require hospital-level evaluation. Her practical hospital options in the Las Vegas Valley are limited, and she has repeatedly received care within the Dignity Health and CommonSpirit system, including encounters reflected in Defendants' own chart at the Siena and San Martin campuses in March, May, and July 2026 alone. Her psychiatric conditions are chronic and recurring, and she has required psychiatric intervention on at least three separate occasions in 2026. Plaintiff's operative directive, executed October 17, 2026 and effective for two years after execution unless revoked, states that Defendants' facilities are acceptable for her care and names them: "St. Rose Dominican Siena, San Martin, and Rose de Lima campuses, and every other Dignity Health and CommonSpirit Health facility, are acceptable for my care. They are not restricted." It records this action and addresses it directly: "Coming to a Dignity facility for treatment is not inconsistent with my claim, does not waive it, and is not a basis to refuse, delay, downgrade, or transfer my care, or to treat me differently in any way." The instrument restricts transport to three facilities, none of them a Defendant facility, and its only absolute refusal of placement is of the state psychiatric hospital. It separately requires that a provider affiliated with an entity against which Plaintiff has asserted a claim disclose that affiliation before participating in care decisions, naming "Dignity

Health / CommonSpirit Health affiliation (including any St. Rose Dominican campus)" expressly, a provision that exists because Plaintiff anticipates presenting at Defendants' facilities while this action is pending. The instrument also instructs any receiving facility, in terms, that "[a]n entry stating that no advance directive exists is factually incorrect and shall be corrected on discovery," and identifies as a documentation-integrity violation "recording on any intake or registration form that I have no advance directive on an occasion when I presented one." Plaintiff will present that instrument at her next encounter, and Defendants will then act, or fail to act, on written notice of the precise failure alleged here. Her recurring needs, her prior and continuing utilization of Defendants' facilities, and the continued operation of the challenged practices create a substantial likelihood of future encounters at which those practices will be applied to her. Each challenged practice concerns information, classifications, or restrictions routinely applied at or shortly after registration, and each remains capable of being applied to her again. Were Defendants to correct those policies and practices, the conditions giving rise to this action would be removed or materially reduced. *City of Los Angeles v. Lyons*, 461 U.S. 95, 101-02 (1983); *Chapman v. Pier 1 Imports (U.S.) Inc.*, 631 F.3d 939, 946-50 (9th Cir. 2011) (en banc).

55. The conduct alleged was not a one-time lapse by a single employee. Defendants' staff described the initiation of commitment proceedings as what the facility "always" does. Defendants' order set attributes the suicide-precaution regime to "facility policy." The advance-directive certification was completed on a standardized Hospital instrument by registration personnel following a standard workflow. The "L2K" classification is a category built into Defendants' operational systems. The sex-designation entries bear the corporate parent's author designation, and the change propagated automatically through Defendants' laboratory system to rewrite the reference ranges on her results. Defendants' document-management process returned

a result and authentication time for her directive later than her own discharge summary. Every restriction Plaintiff suffered flowed from a policy or practice that Plaintiff alleges remains in force and threatens to operate on her again if she returns to Defendants' facilities. The restrictions were imposed and maintained across three calendar days and multiple nursing shifts, and across the emergency department, the hospitalist service, dietary services, laboratory services, health information management, and the discharge process. The attending physician continued them after documenting that no medical hold was needed. On information and belief, supervisory personnel had notice from Plaintiff's repeated objections, from her requests for counsel and for Risk Management, and from the face of the records Defendants' own systems generated, and permitted the conduct to continue through discharge. On information and belief, one or more officers, directors, or managing agents of the entity Defendants, expressly authorized to direct or ratify the conduct of Hospital personnel on the corporation's behalf, adopted, authorized, or ratified those policies and practices; or had advance knowledge that the personnel executing them were unfit and employed those personnel with conscious disregard of the rights and safety of patients; or were themselves guilty of oppression, fraud, or malice.

56. Plaintiff's instrument expressly instructed Defendants, from the moment of receipt, to preserve surveillance footage, restraint logs, medication administration records, electronic health record entries and audit trails, incident reports, staff communications, capacity determinations, and agent contact logs. That instruction placed Defendants on contemporaneous notice of Plaintiff's demand that those materials be preserved and is relevant to determining when litigation and the relevance of those materials became reasonably foreseeable. A detailed preservation demand accompanies service of this Complaint. Plaintiff reserves all rights and remedies concerning any loss or destruction of discoverable information, including any relief

available under Federal Rule of Civil Procedure 37(e). Each Count below incorporates the specific paragraphs identified within it. Those identifications are made to assist the Court and Defendants in locating the factual basis of each Count. Plaintiff does not thereby waive reliance on any factual allegation of this Complaint that bears on any Count, and does not concede that any allegation not expressly identified is immaterial to it.

## V. Causes of action

### Count I

### Negligence based upon failure to recognize and process health care power of attorney and advance directive; declaratory relief

(NRS 162A.700 to 162A.870; NRS 449A.600 to 449A.645; 28 U.S.C. § 2201)

(All Defendants)

57. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 19 (the instrument, its presentation, and Defendants' written certification that it did not exist); 22 and 23 (capacity and the scope of consent); 27 through 29 (the absence of any hold and the exclusion of the designated agent); 35 (denial of the access the instrument reserved); 37 through 40 (the substantive medication and protocol terms, pleaded in the alternative); 45 through 48 (clearance, discharge, and the discharge protections); and 52 through 56 (warnings, injury, recurrence, policy, and preservation).

58. The July 15, 2026 instrument contains a durable power of attorney for health care under NRS 162A.700 to 162A.870. Its execution satisfies the statute. NRS 162A.790(2) requires that the principal's signature on a power of attorney for health care be either "[a]cknowledged before a notary public" or "[w]itnessed by two adult witnesses," and Plaintiff acknowledged her signature before a Nevada notary public. Plaintiff further pleads, in the alternative, that the

instrument constitutes an advance directive for psychiatric care under NRS 449A.600 to 449A.645. That instrument governed the admission at issue. Plaintiff subsequently executed a successor instrument on October 17, 2026, before two qualified witnesses neither of whom is her agent or a provider of her care, and acknowledged before a Nevada notary public, retaining Ms. Ryan's designation as her health care agent and continuing to document Plaintiff's treatment preferences and requested accommodations. The successor instrument modifies certain medication, device, and transport provisions of the July 15 instrument. Plaintiff relies on the July 15 instrument to establish Defendants' notice and conduct during the admission at issue, and on the successor instrument to establish her current preferences, anticipated future encounters, and request for prospective relief. Each instrument's legal effect is determined by its own terms and the law applicable when presented.

59. Plaintiff pleads Defendants' obligations in the alternative, as the statutory structure requires. So long as Plaintiff retained capacity, her own contemporaneous decisions governed, and the instrument's function was documentary and evidentiary: Defendants owed the record-incorporation duty pleaded below and owed her the ordinary obligation to honor a competent adult's refusal. If Defendants contend she lacked capacity at any point, they must identify the determination NRS 449A.624 requires, which is a determination by two providers of health care, one of whom must be the attending physician or a licensed psychologist, that the principal is no longer able to make or communicate decisions regarding the provision of psychiatric care. The produced records contain no such determination by anyone, let alone by two providers meeting that description. On that contention, Plaintiff pleads in the alternative that the instrument became operative, that Ms. Ryan's instructions controlled, and that NRS 449A.636 and NRS 449A.639 attached in full. Defendants may not occupy both positions. They may not treat Plaintiff as

competent for the purpose of executing admission paperwork and disregarding her spoken refusals, and as incapable for the purpose of overriding her stated wishes without consulting the agent she had named.

60. **The duty and its breach.** To the extent the instrument constitutes an advance directive for psychiatric care, NRS 449A.630 obligated Defendants, upon being presented with it, to make it part of Plaintiff's medical record. That duty attaches on presentation and carries no capacity trigger. Independently of that characterization, the instrument contained Plaintiff's acknowledged health care power of attorney and gave Defendants written notice of her designated agent, her treatment preferences, her refusals, and the accommodations she requested. Federal law imposes a further and independent obligation on Defendants as Medicaid participants to document in a prominent part of the medical record whether or not the individual has executed an advance directive, 42 U.S.C. § 1396a(w)(1)(B), a definition reaching a durable power of attorney for health care recognized under state law. Plaintiff presented the instrument within two hours of arrival. What Defendants recorded in the prominent part of her record reserved for that purpose was the opposite of the truth, and fourteen hours later they recorded that no copy had been obtained. That a copy of the instrument surfaces in Defendants' produced records does not answer the claim. The duty runs from presentation, and its evident purpose is to place the instrument before the people making treatment decisions while those decisions are being made. A scan bearing an 11:15 a.m. result and authentication time on July 24, fifty-seven minutes after the attending physician signed the discharge summary, does not discharge a duty that attached two days earlier. Plaintiff does not contend that the scan timestamp alone fixes the moment the instrument first became electronically available. She pleads that the produced records do not establish when it became available, whether

it was ever timely flagged or routed, or whether it was made available to any person treating her, and that those facts are recorded in Defendants' audit trails.

61. **Statutory noncompliance and transfer.** To the extent Chapter 449A applies and the instrument was operative, NRS 449A.636 separately obligated Defendants to comply with it. The statute admits five exceptions, and provides in subsection 2 that where one part of an advance directive cannot be followed because of any of those circumstances, "all other parts of the advance directive must be followed." The produced records identify no exception invoked by Defendants and no documentation supporting any. The exception at subsection 1(d), for a principal admitted to a mental health facility under NRS 433A.145 to 433A.330, is unavailable because Plaintiff was never so admitted, and Defendants' own attending physician documented that no medical hold was needed. The exception at subsection 1(a), for compliance inconsistent with generally accepted standards of care, is unavailable as to the administrative duties on which this Count rests, which call for no clinical judgment at all. The exception at subsection 1(e), for an emergency endangering life or health, is unavailable because the instrument requires the attending physician to document any emergency override within thirty minutes and no such documentation appears anywhere. The statutory form prescribed by NRS 449A.621 directs that a provider "shall promptly notify the principal and, if applicable, the agent of the principal, and document in the principal's medical record any act or omission that is not in compliance with any part of an advance directive," and NRS 449A.639 requires a provider unable to comply to "take all reasonable steps as promptly as practicable to transfer the psychiatric care of the principal to another physician or provider of health care." Defendants did not comply, did not notify Plaintiff, did not notify Ms. Ryan, did not document any noncompliance, and did not transfer her care. The breaches on which this Count rests are administrative: the certification that the instrument did not exist, the recording that no

copy had been obtained, the failure to make it part of the chart and route it to the persons treating her, the failure to notify her or her agent of any deviation, the failure to document deviation, the failure to transfer her care, the exclusion of her designated agent as pleaded in paragraphs 29 and 42 through 43, the denial of the access her instrument reserved as pleaded in paragraph 35, and the discharge conducted without the notice, acknowledgment, supply, or device reapplication the instrument required as pleaded in paragraph 48. Defendants also announced an intended petition for court-ordered admission before any physician had evaluated Plaintiff and before any examining professional had certified anything, which was a misuse of Nevada's commitment machinery that caused her to believe she was legally detained.

62. **Characterization, severability, and relief.** Plaintiff does not contend that NRS 162A.700 to 162A.870 or NRS 449A.600 to 449A.645 create a free-standing statutory action for damages. She pleads those provisions as the source of the duties Defendants owed upon presentation of the instrument, and seeks damages for their breach under ordinary negligence principles. This Count challenges no diagnosis, no treatment decision, and no exercise of clinical judgment. It does not allege that Defendants chose the wrong care. It alleges that Defendants were handed a document and did not do what that document and these statutes required them to do with it. Each act pleaded in paragraph 61 is an act of records administration, communication, or discharge logistics. Registration and health-information personnel performed those functions here, and none of them requires medical art, science, training, or expertise either to perform or to evaluate. Separately and in the alternative, Plaintiff pleads that Defendants' disregard of the instrument's substantive medication and protocol terms as set out in paragraphs 37 through 40 breached the same duties. To the extent the Court holds that any allegation in this alternative pleading sounds in professional negligence, that allegation is severable and should be severed

rather than treated as defeating the administrative theory on which this Count principally rests. This Count accordingly sounds in ordinary negligence and in declaratory relief, and no expert affidavit is required.[2] An actual, present, and justiciable controversy exists concerning the validity, statutory characterization, and legal effect of the instrument, concerning Defendants' obligations under NRS 162A.700 to 162A.870 and under NRS 449A.630, 449A.636, and 449A.639, and concerning whether Defendants complied. That controversy remains live for the reasons pleaded in paragraphs 54 and 55. Plaintiff requests that the Court exercise its authority under 28 U.S.C. § 2201 to grant the declaratory relief described in Paragraph E of the Prayer, and seeks damages in an amount to be proven at trial.

**Count II**

**Assault and battery**

(Entity Defendants and Doe Defendants)

63. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 17 (the instrument, its lorazepam conditions, and its presentation); 22 (capacity); 36 through 38 (the seizure disorder, the standing order, the port, the administrations, and her contemporaneous refusals); 41 through 43 (the safety device and the threat to cut it from her wrist); 52 and 53 (warnings and injury); and 55 (policy, breadth, and corporate authorization and ratification). Battery in Nevada is an intentional, harmful or offensive contact with the person of another, made

[2]No affidavit of merit is required. In federal court, Rules 8 and 12 displace a state statute conditioning suit on an expert affidavit. *Berk v. Choy*, 146 S. Ct. 546, 553, 557 (2026). Independently, this Count does not sound in professional negligence. *Limprasert v. PAM Specialty Hosp. of Las Vegas LLC*, 550 P.3d 825, 829-31, 833 (Nev. 2024) (overruling the common-knowledge exception but preserving the nonmedical-function line of *DeBoer* and *Szymborski*); *DeBoer v. Senior Bridges of Sparks Family Hosp. Inc.*, 282 P.3d 727, 731-32 (Nev. 2012) (non-clinical staff's mishandling of a power-of-attorney instrument sounded in ordinary negligence); *Szymborski v. Spring Mountain Treatment Ctr.*, 403 P.3d 1280, 1285-86, 1288 (Nev. 2017) (one complaint may plead both kinds of claim).

without consent.[3] Assault is an intentional act creating a reasonable apprehension of immediate harmful or offensive contact.

64. Hospital personnel, whose identities are recorded in Defendants' medication administration record and who are named here among the Doe Defendants, administered intravenous lorazepam to Plaintiff on at least three occasions. Each required accessing the port implanted in her body and introducing a controlled substance into her bloodstream. Each was an intentional contact with her person. The entity Defendants are liable for those contacts under the principles stated in note 1.

65. **This Count is not asserted against Dr. Bobby Thomas.** The only intravenous lorazepam authorization Defendants' records attribute to him is confined on its face to active seizure: his admission history and physical directs "Ativan IV for active seizure." Plaintiff does not presently allege that he directed any administration outside that indication, that he performed any administration, or that her refusals were communicated to him before any subsequent dose. A physician who authorizes a seizure-limited order is not the batterer when other personnel exceed it. His entry and continuation of a standing order carrying no consent qualifier, while the instrument conditioning that drug sat in Defendants' possession, is pleaded in Count I as a breach of ordinary care, and his own documented acts are pleaded in Counts V and VI. Plaintiff reserves

---

[3]Battery is an intentional tort: an intentional and offensive touching of a person who has not consented. It is not a claim for the failure to use the care, skill, or knowledge ordinarily used by similarly trained providers. NRS 41A.015. Nevada distinguishes a claim premised on the absence of consent from one premised on the scope of a consent actually given; only the latter sounds in professional negligence. Where "a plaintiff claims not to have consented at all to the treatment or procedure performed by a physician or hospital," that allegation "constitutes a battery claim and thus does not invoke NRS 41A.071's medical expert affidavit requirement." *Humboldt Gen. Hosp. v. Sixth Judicial Dist. Court*, 376 P.3d 167, 172 (Nev. 2016). *Limprasert* abolished the common-knowledge exception to the affidavit requirement, 550 P.3d at 833, but addressed negligence claims and left *Humboldt*'s consent line in place. This Count rests on the absence of consent.

the right to seek leave to amend should discovery establish his direction of, or his knowledge of and acquiescence in, any administration over her refusal.

66. Plaintiff did not consent. She was competent and communicating throughout, and she refused each administration she recalls, in words, to the staff member performing it. A competent adult's contemporaneous refusal of a medication is dispositive, whatever a court concludes about the statutory characterization or operative status of her written instrument. The refusal is the independent ground of this claim. Defendants' own paperwork supplies another: their standing order authorized the drug "PRN: Seizures," and the attending physician's plan confined it to "active seizure," yet each administration Plaintiff recalls occurred while she was conscious, alert, and not then seizing, and therefore outside the stated indication of the order Defendants themselves had written. The instrument supplies further grounds, as pleaded in paragraphs 16 and 37. Defendants administered at least three doses. Ms. Ryan was never notified and authorized nothing. The contacts were harmful and offensive. Each introduced a sedating controlled substance into the body of a competent adult who had refused it, through a surgically implanted device, without her agent's knowledge. The instrument states, in terms, that any administration outside its parameters "constitutes NON-CONSENSUAL CHEMICAL RESTRAINT." To the extent Defendants contend that a general consent to treatment extended to these administrations, Plaintiff did not consent at all to the procedure performed: she refused it in words at the time, and any contact beyond her consent was unprivileged.

67. Defendants' staff also committed an assault. They stood over Plaintiff, a patient they had told was legally detained and whose clothing and property they were in the course of sending out of the building, and announced they would cut the locking device from her wrist. That was a threat of immediate harmful contact with her person, made by persons with the apparent

present ability to carry it out. Plaintiff reasonably apprehended it. Her surrender of the emergency key was compliance extracted by that threat, not consent to the removal.

68. The entity Defendants are liable for these torts, each committed by Hospital personnel in the course of the very tasks assigned to them. Plaintiff was injured and is entitled to compensatory damages, together with punitive and exemplary damages under NRS 42.005, which permits exemplary damages on clear and convincing proof of oppression, fraud, or malice, and, as to the entity Defendants, NRS 42.007 on the predicates pleaded in paragraph 55. See *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 887 (Nev. 1999).

**Count III**

**False imprisonment**

(All Defendants)

69. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 16 (the instrument's observation and restraint conditions); 20 through 35 (voluntary presentation, capacity, the request for voluntary admission and the scope of consent, the announced petition, the asserted legal hold, the "L2K" designation, the absence of any completed hold instrument, the exclusion of her agent, and the conditions of confinement); 44 through 47 (the observation notice, the psychiatric consultation, the clearance for discharge, and the discharge); 52 and 53 (warnings and injury); and 55 (policy, breadth, and corporate authorization and ratification). Defendants restrained Plaintiff's freedom of movement from July 22 through July 24, 2026 without lawful authority.[4] They told her, and told Ms. Ryan in her presence, that she was on a legal hold. They confined her to an emergency department bed, did not permit her to move about the unit, escorted

[4]*Marschall v. City of Carson*, 464 P.2d 494, 497 (Nev. 1970) (restraint under probable imminence of force without legal justification; justification is an affirmative defense); *Hernandez v. City of Reno*, 634 P.2d 668, 671 (Nev. 1981); Restatement (Second) of Torts §§ 35, 41 (1965); *Schlotfeldt*, 910 P.2d at 272-73.

her to the restroom and back, took her clothing and effects, and excluded her agent. The restraint did not consist of the observation Plaintiff had offered. It consisted of the asserted legal authority and of the custodial measures Defendants layered on top of it: a bed she was not permitted to leave, a guard at the toilet door, and a stated legal status she had no means to test. Those measures supplied the probable imminence of force the tort requires, without need of any threat or touching.

70. Plaintiff's request for voluntary admission is no defense. She asked to be admitted voluntarily to a psychiatric facility on the terms her instrument set. She was never admitted to any psychiatric facility. What she received was custodial detention in an emergency department bed under an asserted legal hold, with her agent excluded, her belongings sent out of the building, and her movement controlled. Consent to the one is not consent to the other, and a patient who consents to treatment does not consent to be told, falsely, that she is not free to go. Nor did Plaintiff's written offer of one-to-one observation consent to this confinement, for the reasons pleaded in paragraph 23: the offer was made for a voluntary psychiatric admission that never occurred, it was offered as a level of care rather than a restriction, and the instrument directed in terms that it not be treated as evidence of acuity. Defendants inverted it, imposing the observation as a suicide precaution under a hold while withholding every condition on which it had been offered.

71. Defendants face a dilemma of their own making, and Plaintiff pleads both horns in the alternative. If Chapter 433A governed, as Defendants' conduct asserted when they told Plaintiff she was on a legal hold and coded her "L2K" in their operational systems, then the chapter's conditions and protections attached and Defendants satisfied none of them, as pleaded in paragraph 72, including the release right NRS 433A.140(3) confers on a voluntary consumer. If Chapter 433A did not govern, because Plaintiff was never admitted to a mental health facility as a voluntary consumer and no crisis hold was ever placed, then Defendants possessed no statutory authority of

any kind to restrain her, and the restraint was unlawful from the first minute. Defendants cannot occupy both positions. The reason Plaintiff was never admitted as a voluntary consumer is Defendants' own doing: they held her in an emergency department bed for three days because no psychiatric facility would accept her. Plaintiff filed no written request for release, for the reason pleaded in paragraph 73. Defendants had already told her a hold was in place, which made the request futile on its face. A hospital does not escape liability for misrepresenting a patient's legal status by pointing to the remedy that misrepresentation concealed.

72. The authority Defendants asserted over Plaintiff was a mental health crisis hold, and NRS Chapter 433A governs that authority and fixes the conditions on its exercise. Defendants satisfied none. On the records produced and on information and belief, no person authorized under NRS 433A.160 placed Plaintiff on a crisis hold; no one completed or provided the form prescribed under NRS 433A.085; no one determined, as NRS 433A.0175 and NRS 433A.0195 require, that Plaintiff was a person in a mental health crisis presenting a substantial likelihood of serious harm to herself or others; none of the conditions NRS 433A.162 imposes for emergency admission was met; no licensed physician or physician assistant determined after examination under NRS 433A.165 that Plaintiff had no medical condition requiring immediate treatment; no qualified professional completed the certificate NRS 433A.170 requires; and no psychiatrist or psychologist evaluated her at the time of admission, determined she was a person in a mental health crisis, or approved any admission. Nor did Defendants give the notice the chapter makes mandatory. NRS 433A.190(5) provides that where a patient "has executed a durable power of attorney for health care pursuant to NRS 162A.700 to 162A.870, inclusive, or appointed an attorney-in-fact using an advance directive for psychiatric care pursuant to NRS 449A.600 to 449A.645, inclusive," the facility "must ensure that the guardian, agent designated by the durable power of attorney or the

attorney-in-fact, as applicable, is promptly notified of the admission," and that duty applies "regardless of whether the person alleged to be a person in a mental health crisis has given permission." Plaintiff's instrument is both. Defendants notified Ms. Ryan of nothing. Defendants' own attending physician documented that no medical hold was needed. Plaintiff does not plead the absence of every conceivable ground on which a hospital might briefly restrain a patient; justification is an affirmative defense Defendants must plead and prove. She pleads that the specific authority Defendants invoked, told her she was subject to, and recorded in their own operational systems did not exist.

73. Confinement need not be accomplished by locked doors. Defendants asserted legal authority over Plaintiff, told her and told Ms. Ryan in her presence that she was "on a legal hold," and repeated the designation "L2K" in writing at every meal for the length of the stay. Plaintiff knew what that designation meant, and she understood that a person so placed may be detained for a period not exceeding seventy-two hours unless released sooner or unless further proceedings are commenced. NRS 433A.145(2); NRS 433A.162. Her understanding was not reconstructed afterward. She had written it down a week before this admission, in the instrument she handed Defendants' staff, which acknowledges that Nevada's framework "permits emergency admission for up to 72 hours." Plaintiff accordingly made no demand to leave and no attempt to walk out. That is not consent. A person told she is already in legal custody does not consent to her confinement by declining to test it. She submitted because Defendants represented that she was detained, and because she understood from direct prior experience that an attempt to leave would invite physical restraint or escalation of the petition the nurse had announced she was "starting." She was aware of the confinement throughout, reasonably believed she was not free to leave, and reported that belief in writing to her outpatient psychiatrist's office promptly after release. Every

outward manifestation confirmed the representation, as pleaded in paragraphs 30 through 35. Had Defendants disclosed that no legally effective crisis hold had been placed and that she retained the ability to request discharge or leave against medical advice, Plaintiff would have exercised that choice. Whatever justification Defendants may claim for the earliest hours, none survived into the last. By the morning of July 23 the attending physician had documented that no medical hold was needed and Plaintiff had denied suicidal ideation. By that evening the consulting psychiatrist had cleared her for discharge home. Defendants confined her through that night and into the next morning anyway.

74. Defendants' representation of Plaintiff's legal status was a knowing misrepresentation, made in words and repeated in writing to keep her confined. The conduct was undertaken pursuant to a practice Defendants' own staff described as what the facility "always" does, pursuant to a suicide-precaution regime Defendants' own order set attributes to "facility policy," and pursuant to a classification built into Defendants' operational systems. The corporate authorization, ratification, and advance knowledge pleaded in paragraph 55 are pleaded as to this Count. Plaintiff was injured and is entitled to compensatory damages, together with punitive and exemplary damages under NRS 42.005 and, as to the entity Defendants, NRS 42.007.

**Count IV**

**Negligence per se**

(All Defendants)

75. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 19 (the instrument, its presentation, and the certification that it did not exist); 22 and 23 (capacity and the scope of consent); 28 through 38 (the exclusion of her agent, the conditions of confinement, the denial of the grievance disclosures, and the lorazepam administered over her refusal); 44 (the

observation notice and the inconsistency on status); 47 and 48 (the discharge and the discharge protections); and 52 and 53 (warnings and injury). Nevada statutes impose specific, non-discretionary duties on providers of health care with respect to patient rights, and those statutes exist to protect patients such as Plaintiff from precisely the harms she suffered.[5] Plaintiff does not plead the provisions of NRS Chapter 433A as negligence per se predicates in this Count, except as stated in paragraph 78(e). She pleads them principally in Count III, where they measure the legal authority Defendants asserted and never obtained.

76. Defendants violated the following provisions, each of which confers a specific right on hospital patients and each of which maps directly to an injury Plaintiff suffered:

(a) **NRS 449A.106(9)**, by denying Plaintiff the visitors of her choosing, including the agent she had designated in a written instrument, through exclusion rather than any reasonable restriction as to time or place; and

(b) **NRS 449A.112(1)(b)**, which secures the right to refuse treatment to the extent permitted by law, by administering intravenous lorazepam over the contemporaneous refusal of a competent adult.

77. Plaintiff is a member of the class each provision was enacted to protect, and her injuries are of the type each was enacted to prevent. Defendants' violations proximately caused those injuries. Neither predicate depends upon the statutory characterization of Plaintiff's instrument. The predicates in paragraph 76 are pleaded against the entity Defendants and against

[5] "A violation of statute establishes the duty and breach elements of negligence only if the injured party belongs to the class of persons that the statute was intended to protect, and the injury is of the type against which the statute was intended to protect." *Ashwood v. Clark County*, 930 P.2d 740, 744 (Nev. 1997) (citing *Sagebrush Ltd. v. Carson City*, 660 P.2d 1013, 1015 (Nev. 1983)). Each predicate pleaded here is a legislative enactment, not an administrative regulation. Cf. id. at 744 n.3. The doctrine borrows the statutory standard to supply the duty and breach elements of a negligence claim; it does not depend on the statute creating a private right of action.

the Doe Defendants who excluded Ms. Ryan and who administered the lorazepam. Consistent with paragraph 65, Plaintiff does not allege that Dr. Thomas performed either act. As to him, Plaintiff pleads the alternative predicates in paragraph 78(c) and (d), which concern the handling of the instrument and the conduct of the discharge.

78. Plaintiff pleads the following in the alternative, as negligence per se to the extent the Court so holds and as evidence of the applicable standard of care and of Defendants' breach in any event:

(a) **NRS 449A.118(3)(b), (e) and (f)**, by failing to provide on admission the contact information for the persons to whom complaints and grievances may be expressed, including a patient representative or hospital social worker, the Bureau for Hospital Patients disclosure required by NRS 232.462, and contact information for entities that investigate complaints concerning abuse or neglect of patients. Those disclosures exist to give a confined patient a channel out. Without them, the only inquiry Plaintiff could make was to ask for the Hospital's counsel and for Risk Management, and Defendants told her the Hospital had neither. Her confinement, the exclusion of her agent, and the restrictions she objected to continued through discharge.

(b) **NRS 449A.112(1)(a) and (d)**, which guarantee considerate and respectful care and privacy concerning the patient's own program of medical care, and **NRS 449A.112(2)**, which secures the confidentiality of the patient's discussions, consultations, examinations, treatment, communications, and records.

(c) To the extent the instrument constitutes an advance directive for psychiatric care, **NRS 449A.630**, and, independently of that characterization, the federal documentation obligation imposed on Defendants as Medicaid participants by **42 U.S.C.**

**§ 1396a(w)(1)(B)**; and to the extent the instrument was operative, **NRS 449A.636 and 449A.639**.

(d) **NRS 449A.300 to 449A.330**, the caregiver-designation statutes, by failing to afford Plaintiff the opportunity to designate a caregiver, to record the designation of the person who already held her health care power of attorney and whom NRS 449A.309 defines as her representative, to notify that caregiver of the planned discharge, and to provide and consult upon a discharge plan. Plaintiff pleads this predicate expressly in the alternative as to inpatient status, and does not contend that the caption of a discharge packet establishes a legally qualifying inpatient admission. Defendants' own packet is captioned "Inpatient Discharge Instructions" and their discharge summary recites that psychiatry saw her "while inpatient." If those records are accurate, the caregiver duties attached. If they are not, Defendants' records misstate the nature of the admission they imposed.

(e) To the extent Defendants contend that NRS Chapter 433A governed Plaintiff's status, as their representations to her asserted, **NRS 433A.190(5)**, by failing to ensure that the agent designated in her durable power of attorney for health care was promptly notified of the admission, a duty the statute imposes without regard to the patient's permission; and **NRS 433A.350**, by failing to furnish on admission the written statement of release procedures and patient rights the section requires and by failing to provide the protection-and-advocacy contact information the section directs be posted and given to each consumer.

Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

**Count V**

**Intentional infliction of emotional distress**

(All Defendants)

79. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 19 (the instrument, its presentation, and the certification that it did not exist); 24 through 43 (the announced petition, the asserted hold and "L2K" designation, the exclusion of her agent, the conditions of confinement, the lorazepam administered over her refusal, the medication escalations, the uninfused hydration protocol, and the threat to cut the safety device from her wrist); 45 through 53 (the clearance for discharge, the discharge, the sex designation and its propagation, her warnings, and her injuries); and 55 (policy, breadth, and corporate authorization and ratification). The elements are "(1) extreme and outrageous conduct with either the intention of, or reckless disregard for, causing emotional distress, (2) the plaintiff's having suffered severe or extreme emotional distress and (3) actual or proximate causation." *Dillard Dep't Stores, Inc. v. Beckwith*, 989 P.2d 882, 886 (Nev. 1999) (quoting *Star v. Rabello*, 625 P.2d 90, 92 (Nev. 1981)).

80. Defendants' conduct was extreme and outrageous. They took a notarized instrument from the hands of a competent patient, examined it, asked whether she had downloaded it from the internet, and certified in writing that it did not exist. They told her she was in legal custody and printed the custodial designation on her meals for three days without ever completing the form that would have made it true. They put her designated agent out of the building with everything Plaintiff owned, leaving a woman with a documented seizure disorder and a documented dissociative condition in two gowns with nothing underneath, confined to a bed, denied a fork, and escorted to the toilet. They pushed a sedating controlled substance through a port implanted in her body, over her spoken refusal, without telling the advocate they had removed.

They threatened to cut a locking safety device from her wrist while documenting that a different locked item she wore need not be disturbed. When she asked for the Hospital's lawyers and for Risk Management, they told her the Hospital had neither. They changed a transgender woman's sex in the chart mid-admission and let it rewrite the reference ranges on her blood work. They released her with no medications, no transportation, and no device on her wrist.

81. Defendants acted intentionally or with reckless disregard of the probability of causing severe emotional distress. They knew Plaintiff's psychiatric and neurological diagnoses because their own records catalogue them. They had been handed a document describing exactly how their conduct would harm her. Plaintiff told them, in words, that they were violating it. They proceeded anyway. **Conduct of Dr. Bobby Thomas.** Plaintiff pleads against Dr. Thomas the acts he himself ordered, documented, or performed, and not conditions imposed by registration or nursing personnel he did not direct. He documented in his own history and physical that no medical hold was needed and continued Plaintiff's confinement through the following morning regardless. He recorded that she reported a seizure "several minutes prior to my arrival" with "no post-ictal state note," and took no responsive action. Defendants' July 22 emergency department note recorded Plaintiff's home aripiprazole dose as 5 mg daily. A subsequent medication reconciliation reflected 15 mg daily. Dr. Thomas then ordered aripiprazole at 15 mg daily and carried that dose forward on the discharge medication list, without reconciling the discrepancy reflected in the earlier emergency department record or documenting consultation with Plaintiff or Ms. Ryan regarding the change. Plaintiff does not presently allege that Dr. Thomas originated the medication-reconciliation entry; she alleges that he issued and maintained the order reflecting the elevated dose. He authored the order set containing the standing intravenous lorazepam order and left it in force without a consent condition. He signed the discharge summary recording this

transgender woman's sex as male, hours after Defendants' own laboratory system had timestamped the change and begun rewriting her reference ranges.

82. Plaintiff suffered severe emotional distress, including humiliation, fear, panic, exacerbation of her documented psychiatric and neurological conditions, and loss of trust in medical care, together with physical manifestations including disrupted sleep, nightmares, loss of appetite, and panic episodes. She is entitled to compensatory damages, together with punitive and exemplary damages under NRS 42.005 and, as to the entity Defendants, NRS 42.007 on the predicates pleaded in paragraph 55.

**Count VI**

**Abuse and neglect of a vulnerable person**

(NRS 41.1395) (All Defendants)

83. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 19 (the instrument, its presentation, and Defendants' knowledge of her conditions); 24 through 48 (the asserted hold, the exclusion of her agent, the conditions of confinement, the lorazepam, the medication escalations, the uninfused hydration protocol, the threat to the safety device, the clearance for discharge, and the discharge); 52 and 53 (warnings and injury); 55 (policy, breadth, and corporate authorization and ratification); and 91 (her impairments and their substantial limitation of major life activities). Plaintiff is a vulnerable person within the meaning of NRS 41.1395(4)(e), which requires two things.[6] First, she has physical and mental impairments that substantially limit one or more major life activities, as pleaded in paragraph 91. Second, she has a medical and psychological record of those impairments: Defendants' own problem list catalogues

[6]NRS 41.1395(4)(a), (c), (e) (defining abuse, neglect, and vulnerable person, the last expressly including a person with a severe mental or emotional illness); NRS 41.1395(1)-(3) (double damages, mandatory fees, and a defense limited to lack of knowledge).

her seizure disorder, dissociative identity disorder, bipolar I disorder, schizoaffective disorder, PTSD, OCD, diabetes, dysautonomia, and pulmonary embolism as confirmed and active. In the alternative, Defendants otherwise regarded her as having those impairments, which is why they imposed a suicide-precaution regime within eighteen minutes of her arrival. Her bipolar I disorder, schizoaffective disorder, dissociative identity disorder, and PTSD place her within a class the statute expressly enumerates, which includes without limitation a person who suffers from a severe mental or emotional illness. The impairments are functional, not nominal. Her seizure disorder is medication-resistant. Her dissociative condition produces an elopement risk documented in Defendants' own chart and is the reason she wears a locking monitoring device. Her dysautonomia requires scheduled intravenous hydration three times each week through a surgically implanted port. Her psychiatric conditions impair her capacity to advocate for herself under stress, which is why she executed an instrument designating someone to do it.

84. **Willful and unjustified infliction of pain, injury, and mental anguish.** NRS 41.1395(4)(a)(1). Each act pleaded in this paragraph was volitional, not accidental, and none was justified by any authority Defendants held or any consent Plaintiff gave. Defendants confined Plaintiff for three calendar days on an authority they never obtained and told her she had no choice, and continued the confinement after their own attending physician documented that no medical hold was needed and their own consultant cleared her for discharge home. They excluded the caregiver she had designated in a notarized instrument and compelled removal of the one device through which that caregiver could reach her directly. They threatened to bring a cutting instrument to her wrist to destroy a safety device that guards against an elopement risk their own records confirm. They confined her to a bed, escorted her to the toilet, and denied her eating utensils. They sedated her through a device implanted in her body over her spoken refusal, in repeat doses her

instrument permitted only on Ms. Ryan's explicit authorization, which Defendants never sought and she never gave. Plaintiff does not plead the interim imposition of safety precautions, standing alone, as abuse. She pleads the assertion of a custodial authority Defendants never obtained, and the maintenance of every restriction that authority carried after Defendants' own records had removed any basis for it.

85. **Deprivation of clothing and of necessary services; neglect.** NRS 41.1395(4)(a)(2) and (4)(c). Defendants sent Plaintiff's backpack out of the building at admission with every article of her clothing in it and left her in two hospital gowns for three days with nothing underneath, making no provision for clothing at any point, including at discharge. They did not administer the scheduled intravenous hydration their own records identify among the medical needs affecting her placement, during a confinement that spanned a scheduled session. They did not provide the supplemental oxygen her own documented protocol specifies and which the instrument in their possession directed be available. They discharged her with no medication supply, no prescriptions, and no written follow-up instructions. Plaintiff pleads those same deprivations in the alternative as neglect under NRS 41.1395(4)(c), which requires no showing that the failure was willful or unjustified. Defendants assumed legal responsibility and a contractual obligation for Plaintiff's care when they admitted her on the Conditions of Admission instruments she signed and confined her for three days, and the clothing and the regimens identified above fell within the scope of that responsibility and obligation. This Count does not rest on any disagreement with a clinical judgment. It rests on unjustified confinement, on the stripping of her clothing and property, on the removal of her caregiver and the means of reaching her, on a threat to her person, and on the non-administration of regimens prescribed elsewhere and documented in Defendants' own chart. To the extent the Court holds that any allegation in this Count sounds in

professional negligence, that allegation is severable and should be severed rather than treated as defeating the Count. See note 2.

86. **Conduct of Dr. Bobby Thomas.** Dr. Thomas documented that no medical hold was needed and continued Plaintiff's confinement through the following morning regardless, which is the willful and unjustified character the statute describes. He ordered an antipsychotic dose three times the one Defendants' emergency department note of the previous day records as her home dose, and continued it at discharge, without consulting the caregiver the instrument names and whose consultation the instrument requires before any such change. He discharged her with no medication supply, no prescriptions, no written follow-up instructions, and no notice to that caregiver.

87. Defendants knew or had reason to know that Plaintiff was a vulnerable person. Their own records catalogued every qualifying condition, and the instrument she handed them recited the same conditions in writing. Plaintiff suffered personal injury caused by abuse and, in the alternative, by neglect, and accordingly seeks two times her actual damages under NRS 41.1395(1), together with her attorney's fees and costs under NRS 41.1395(2) to the extent recoverable, and the punitive and exemplary damages available under NRS 42.005 and NRS 42.007 on the predicates pleaded in paragraph 55.

**Count VII**

**Negligent training and supervision**

(Entity Defendants)

88. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 17 through 19 (the presentation of the instrument and the certification that it did not exist); 24 through 27 (the announced petition, the asserted hold, the "L2K" designation, and the absence of any completed

hold instrument); 30 through 35 (the conditions of confinement and the denial of counsel, Risk Management, and the grievance disclosures); 41 through 43 (the threat to the safety device); and 49 through 53 and 55 (the sex designation, its propagation, her injuries, and the breadth and duration of the conduct). An employer owes a duty to use reasonable care in the training and supervision of its employees to make sure they are fit for their positions. *Hall v. SSF, Inc.*, 930 P.2d 94, 99 (Nev. 1996). That duty includes a general obligation "to conduct a reasonable background check on a potential employee to ensure that the employee is fit for the position." Id. at 98 (quoting *Burnett v. C.B.A. Security Serv.*, 820 P.2d 750, 752 (Nev. 1991)). An employer's lack of notice of an employee's propensities does not relieve it of that obligation, and whether the conduct occurred within the scope of employment is immaterial to this Count. *Rockwell v. Sun Harbor Budget Suites*, 925 P.2d 1175, 1181 & n.5 (Nev. 1996).

89. The entity Defendants breached that duty. They deployed registration personnel who certified the nonexistence of an instrument a patient had just handed over, on a standardized form completed through a workflow that made no provision for the situation. They deployed nursing staff who told a patient she was on a legal hold no one had placed, who threatened to cut a locking safety device from her wrist, and who told her the Hospital had no counsel and no Risk Management. They maintained systems that printed a custodial classification on her meals for three days with no underlying instrument, returned her directive with a result and authentication time later than her own discharge summary, and permitted a patient's sex to be changed mid-admission with automatic rewriting of her laboratory reference ranges. On information and belief, the entity Defendants provided no adequate training on the receipt, scanning, flagging, and clinical availability of advance directives and health care powers of attorney, on the recognition of designated agents, on the statutory predicates for a mental health crisis hold, or on the recording

and protection of patient sex and gender identity designations, and they failed to supervise the personnel who carried out the conduct alleged. The breadth and duration pleaded in paragraph 55 are pleaded here as evidence of that failure and of supervisory notice. Those failures proximately caused Plaintiff's injuries. This Count sounds in ordinary negligence for the reasons stated in note 2; a claim for negligent training and supervision does not sound in professional negligence where the underlying facts involve no medical judgment, diagnosis, or treatment. *Szymborski*, 403 P.3d at 1288. Plaintiff is entitled to compensatory damages in an amount to be proven at trial.

**Count VIII**

**Disability discrimination**

(ADA Title III, 42 U.S.C. §§ 12181 et seq.) (Entity Defendants)

90. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 19 (the instrument containing her modification requests, its presentation, and Defendants' response); 28 through 43 (the exclusion of her agent, the conditions of confinement, the denial of devices and writing materials, the lorazepam administered without notice to her agent, the uninfused hydration protocol, and the compelled removal of the safety device); and 52 through 55 (warnings, injury, recurrence, and policy). Plaintiff must show that she is disabled, that the entity Defendants operate a place of public accommodation, that they employed a discriminatory policy or practice, and that they failed to make a requested reasonable modification necessary to accommodate her disability. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004); see 42 U.S.C. § 12182(b)(2)(A)(ii). A modification is not unreasonable merely because compliance may occasionally require the entity to take affirmative steps to enforce its own policy. Id. at 1083-84. In the modification context, identical treatment is no defense: the ADA "defines discrimination as a public accommodation treating a disabled patron the same as other patrons

despite the former's need for a reasonable modification." Id. at 1086. Plaintiff seeks prospective relief only on this Count.

91. Plaintiff is a qualified individual with disabilities. Defendants' own records catalogue her seizure disorder, dissociative identity disorder, bipolar I disorder, PTSD, OCD, diabetes, dysautonomia, and pulmonary embolism among her active problems, and Defendants had actual knowledge of each. Those impairments substantially limit major life activities including caring for herself, concentrating, thinking, communicating, sleeping, and working, and substantially limit the operation of major bodily functions including neurological, brain, endocrine, and circulatory function. Her seizure disorder and psychiatric conditions are episodic, and each would substantially limit a major life activity when active. 42 U.S.C. § 12102(2)(A), (B), (4)(D). Congress directed that the definition of disability "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter," § 12102(4)(A), and that "substantially limits" be interpreted consistently with the ADA Amendments Act of 2008, § 12102(4)(B), which rejected the narrower standard earlier applied in *Toyota Motor Manufacturing, Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002). The Hospital is a place of public accommodation under 42 U.S.C. § 12181(7)(F), and no individual may be discriminated against on the basis of disability "in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation." § 12182(a).

92. **Classification without individualized assessment.** The statute makes it discriminatory to subject "an individual or class of individuals on the basis of a disability or disabilities of such individual or class" to "a denial of the opportunity of the individual or class to participate in or benefit from the goods, services, facilities, privileges, advantages, or

accommodations of an entity." 42 U.S.C. § 12182(b)(1)(A)(i). The custodial regime Defendants imposed issued because of Plaintiff's psychiatric diagnoses and not because of any individualized finding about her. The one-to-one observation order, the suicide-precaution regime, the denial of eating utensils, the confiscation of her clothing and effects, the escorted restroom use, and the confinement to a bed all issued within eighteen minutes of her arrival, "per facility policy," before any physician had examined her, and the produced records contain no individualized assessment at any point. A patient who presented to the same emergency department with a seizure disorder and no psychiatric history would not have been stripped of her clothing, denied a fork, confined to a bed, and escorted to the toilet. Plaintiff does not contend that a hospital may never impose interim safety measures while it assesses a patient who has reported suicidal ideation. She contends that Defendants classified her by diagnosis, imposed and then maintained every restriction that classification carried for three calendar days without ever assessing what she in particular required, continued them after their own attending physician documented that no medical hold was needed and their own consultant cleared her for discharge, and refused each modification she requested. That Defendants apply the same classification to other patients bearing the same diagnoses does not answer that claim, because the provision reaches a class of individuals as well as an individual.

93. Plaintiff requested reasonable modifications of Defendants' policies and practices, each tied to a specific disability Defendants knew she had:

(a) **Access and physical presence for her designated agent.** Plaintiff's dissociative identity disorder and psychiatric conditions impair her ability to advocate for herself under stress and can produce presentations an unfamiliar clinician will misread. Her instrument designated Ms. Ryan to fill that gap and identifies her as the person who can

tell staff what they are seeing. Ms. Ryan was physically present at intake. Defendants put her out.

(b) **Retention of the locking GPS safety device.** The device guards against an elopement risk arising from Plaintiff's dissociative condition, which Defendants' own problem list records as confirmed and active, and it is the direct communication link between Plaintiff and her agent. Defendants compelled its removal under threat of destruction.

(c) **Notification of her agent before sedating medication, and before any change to her psychotropic regimen.** That is a communication accommodation for a patient whose conditions can leave her unable to speak for herself in the moment, not a demand for any particular course of treatment. Defendants notified her of nothing and tripled the antipsychotic dose without a word.

(d) **Non-interruption of her existing outpatient hydration protocol.** Plaintiff does not seek any particular course of treatment. She asked that Defendants not interrupt an independently prescribed outpatient regimen during a confinement Defendants imposed. The protocol manages a documented dysautonomia with syncope and fall risk, and Defendants' records identify it among the medical needs affecting her placement in a medical bed. On information and belief, Defendants administered no infusion during a stay that spanned a scheduled session.

(e) **A means of communication and of writing.** Plaintiff's conditions impair her ability to retain and relay information under stress, which is why her instrument designates an agent and requires access to the means of reaching her. Defendants sent out the telephone through which Plaintiff could reach Ms. Ryan, compelled removal of the

device through which Ms. Ryan could reach Plaintiff, and denied her any writing implement with which to record what was happening or note what she needed to tell her agent or her outpatient providers. Her instrument expressly offered one-to-one observation as the accommodation neutralizing any facility security concern about device access, and states that a patient-requested observation level "is a level of care, not a restriction." Defendants imposed one-to-one observation and characterized it as a suicide precaution. They took the entire burden of the accommodation Plaintiff offered and withheld every benefit it was designed to purchase.

94. Defendants denied each modification. They performed no individualized assessment of any of them, and the produced records reflect none. They identified no fundamental alteration any modification would have worked. They cannot invoke the direct-threat defense, which by statute concerns "a significant risk to the health or safety of others." 42 U.S.C. § 12182(b)(3). Their own contemporaneous accommodation of Plaintiff's locked earrings refutes any claim that leaving a locked item in place was infeasible, and the one-to-one observation they had already ordered refutes any claim that supervised device access was. Defendants further used standards, criteria, and methods of administration having the effect of discriminating on the basis of disability. § 12182(b)(1)(D). The advance-directive certification was completed on a standardized instrument by registration personnel following a workflow making no provision for a patient who arrives holding a directive. The suicide-precaution regime was applied "per facility policy," eighteen minutes after arrival, without individualized assessment. The breadth and duration pleaded in paragraph 55 establish that those were institutional methods of administration rather than the improvisation of any individual. Plaintiff pleads the facts in paragraph 54 as establishing a real and immediate threat that each challenged policy and practice will be applied

to her again at a future encounter, and seeks the injunctive relief described in Paragraph F of the Prayer.

**Count IX**

**Disability discrimination**

(Rehabilitation Act § 504, 29 U.S.C. § 794) (Entity Defendants)

95. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties, including the entity Defendants' receipt of federal financial assistance); 14 through 19 (the instrument containing her modification requests, its presentation, and Defendants' response); 28 through 43 (the exclusion of her agent, the conditions of confinement, the denial of devices and writing materials, the lorazepam administered without notice to her agent, the uninfused hydration protocol, and the compelled removal of the safety device); 52 through 55 (warnings, injury, recurrence, and policy); and 90 through 94 (her disabilities, the classification imposed without individualized assessment, the modifications she requested, and Defendants' denial of each). The entity Defendants receive federal financial assistance, including Medicaid reimbursement. Because CommonSpirit Health is principally engaged in the business of providing health care, "program or activity" reaches all of its operations, not merely the funded component. 29 U.S.C. § 794(b)(3)(A)(ii). Plaintiff is an otherwise qualified individual with disabilities as pleaded in paragraph 91. She was denied the benefits of, and subjected to discrimination under, Defendants' program solely by reason of her disabilities, through the denials pleaded in paragraphs 93 and 94 and the classification-based custodial regime pleaded in paragraph 92.

96. Defendants acted with deliberate indifference.[7] They had notice from the instrument Plaintiff handed them, from her express requests, and from their own records. They investigated nothing and offered nothing. When Plaintiff objected that they were obstructing her litigation, they told her the Hospital had telephones. When she objected to removal of the safety device, they threatened to cut it off. When she asked for Risk Management, they told her Risk Management was not there. Their failure was more than negligent and involved an element of deliberateness.

97. This Count is a claim for past discrimination and does not depend upon any showing that Plaintiff will return to Defendants' facilities. Plaintiff seeks the economic damages pleaded in paragraph 53, nominal damages, declaratory relief, and injunctive relief. She does not seek punitive damages or damages for emotional distress on this Count. Respondeat superior applies to claims brought directly under Section 504.

**Count X**

**Disability and sex discrimination**

(ACA § 1557, 42 U.S.C. § 18116) (Entity Defendants)

98. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties, including the entity Defendants' receipt of federal financial assistance); 14 through 19 (the instrument, which records her transgender status, her name, and her pronouns, and its presentation); 28 through 43 (the exclusion of her agent, the conditions of confinement, and the denial of the modifications she requested); 49 through 55 (the sex designation, the rewritten reference ranges, the propagation of the change, her warnings, her injuries, recurrence, and policy); and 90 through 96 (her disabilities,

[7] *Duvall*, 260 F.3d at 1138-41 (deliberate indifference; vicarious liability); *Barnes*, 536 U.S. at 189 (no punitive damages); *Cummings*, 596 U.S. at 212 (no emotional distress damages); *Chapman*, 631 F.3d at 946 n.3 (Title III: injunctive relief only).

the classification imposed without individualized assessment, the modifications she requested, Defendants' denial of each, and their deliberate indifference). Section 1557 prohibits exclusion from participation in, denial of the benefits of, or discrimination under any health program or activity receiving federal financial assistance on any ground prohibited under Title VI, Title IX, the Age Discrimination Act, or Section 504. 42 U.S.C. § 18116(a). The Hospital is such a program or activity. This claim rests on the statutory text and not upon any regulation promulgated under Section 1557, the rulemaking authority of which is permissive by its terms. § 18116(c). The disability theory is pleaded in paragraphs 91 through 96 and is incorporated here.

99. Defendants discriminated on the basis of sex. The conduct was sex-based because the characteristic Defendants altered was sex itself. Defendants did not misrecord Plaintiff's name, her address, or her date of birth. They changed the field recording the protected characteristic, for a patient whose transgender status they knew, and conformed her record to a sex other than the one under which she lives, receives continuous hormone therapy, and had been treated by Defendants' own clinicians for two full days. Defendants knew that status: her instrument states it in terms, records the hormone therapy, and directs that she be addressed as Jade and by she/her pronouns. Plaintiff does not contend that every error in a sex field is actionable. She pleads the documented facts. Defendants' own records recorded her as female through two days of care, in the emergency department note of July 22, the history and physical of July 23, the registration face sheets of both days, both versions of the observation notice, and the pharmacy note of July 23. The change came at 5:28 p.m. on July 23. Plaintiff did not request it, and no one asked her about it. No clinical finding, laboratory result, examination, patient request, or administrative correction appears anywhere in the produced records to account for it. Plaintiff does not presently know whether the field was changed manually by an identified employee or by an automated mapping

rule, and pleads both mechanisms in the alternative as subjects of discovery. The mechanism and the basis for the change are recorded in Defendants' audit trail and within Defendants' exclusive knowledge and control. The harm was not confined to a demographic field, which is what distinguishes this change from a clerical error. As pleaded in paragraphs 50 and 51, it immediately rewrote the reference ranges against which her creatinine, hemoglobin, hematocrit, ALT, and BUN were read, denying her the accurate sex-specific clinical reporting Defendants afford patients generally; carried into the discharge summary Dr. Thomas signed; propagated into chart fields modified after that summary was signed and bearing CommonSpirit's author designation; and misstates the clinical baseline for a patient on continuous hormone therapy in every record Defendants transmit. The designation remains in Defendants' records as of filing. Plaintiff pleads the denial of accurate sex-specific clinical reporting as discrimination on the basis of sex, and pleads in the alternative that Defendants discriminated against her on the ground of gender identity.

100. Defendants acted with deliberate indifference as pleaded in paragraph 96. Plaintiff seeks the economic damages pleaded in paragraph 53, nominal damages, declaratory relief, and the injunctive relief described in Paragraph F of the Prayer, subject to the remedial limits stated in note 7. She does not seek punitive damages or damages for emotional distress on this Count.

**Count XI**

**Retaliation, coercion, and interference**

(ADA, 42 U.S.C. § 12203) (Entity Defendants)

101. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties); 14 through 19 (the instrument containing her modification requests and its repeated presentation); 28 and 29 (the designation and exclusion of her agent); 35 through 38 (the denial of devices and writing materials, the responses to her requests for counsel and Risk Management, and her refusals of the

lorazepam); 41 through 43 (her objection to removal of the safety device and the threat to cut it from her wrist); 52 through 55 (her warnings, her injuries, recurrence, and policy); and 93 (the modifications she requested). Section 12203(a) provides that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter." Section 12203(b) provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any individual in the exercise or enjoyment of, or on account of his or her having exercised or enjoyed ... any right granted or protected by this chapter." Section 12203(c) makes the remedies of 42 U.S.C. § 12188 available for violations with respect to Title III, and Plaintiff accordingly seeks injunctive relief only on this Count. Neither subsection requires that the plaintiff prove she is disabled, and neither depends upon the statutory characterization of her written instrument.[8]

102. **Protected activity.** Plaintiff opposed practices made unlawful by the ADA and exercised rights the ADA protects. She handed Defendants a written instrument containing the modification requests pleaded in paragraph 93, and she handed it to them more than once. She told staff their conduct violated it. She objected to the administration of lorazepam. She objected to the compelled removal of the device that guards a disability-related elopement risk and supplies her only direct link to her designated agent. She asked that her agent be permitted to remain. She asked for the Hospital's legal counsel and for Risk Management, which is how a patient inside a facility opposes the conduct of that facility.

---

[8] "Pursuing one's rights under the ADA constitutes a protected activity." *Pardi v. Kaiser Found. Hosps.*, 389 F.3d 840, 850 (9th Cir. 2004). A request for a reasonable modification is therefore protected, and § 12203(b) reaches coercion, intimidation, threats, and interference without requiring proof of a discrete adverse action. The remedies available for a § 12203 violation with respect to Title III are those of 42 U.S.C. § 12188. § 12203(c).

103. **Coercion, interference, and retaliation.** Defendants' responses are pleaded as violations of subsections (a) and (b). When Plaintiff presented the instrument, a nurse asked whether she had downloaded it from the internet, and later asked whether she was trying to scare the staff, which treated an assertion of statutory rights as a hostile act. When Plaintiff objected to removal of the safety device, staff threatened to cut it from her wrist. A threat to destroy the very device whose retention is the requested modification is coercion within the plain terms of subsection (b). When Plaintiff asked that her agent remain, Defendants put Ms. Ryan out of the building carrying Plaintiff's clothing, telephone, laptop, and case files, which removed both the advocate and every means of summoning her. When Plaintiff sought the internal channels through which a patient complains, Defendants told her the Hospital had no counsel and that Risk Management was not there, and the disclosures Nevada law requires on admission, pleaded in paragraph 35, had not been given. The effect was to leave Plaintiff with no avenue to press any request and no one to press it to, and she stopped asserting her rights. Under subsection (b), that chilling is itself the violation. Plaintiff pleads the facts in paragraph 54 as establishing a real and immediate threat of recurrence, and seeks the injunctive relief described in Paragraph F of the Prayer.

## Count XII

## Retaliation and intimidation

(Rehabilitation Act § 504, 29 U.S.C. § 794; 45 C.F.R. §§ 84.98, 80.7(e)) (Entity Defendants)

104. Plaintiff realleges and incorporates paragraphs 4 through 8 (the parties, including the entity Defendants' receipt of federal financial assistance); 14 through 19 (the instrument containing her modification requests and its repeated presentation); 28 and 29 (the designation and

exclusion of her agent); 35 through 38 (the denial of devices and writing materials, the responses to her requests for counsel and Risk Management, and her refusals of the lorazepam); 41 through 43 (her objection to removal of the safety device and the threat to cut it from her wrist); 52 through 55 (her warnings, her injuries, recurrence, and policy); 93 (the modifications she requested); 95 (the entity Defendants' status as recipients of federal financial assistance); and 101 through 103 (her protected activity and Defendants' coercive responses). The regulations implementing Section 504 adopt the enforcement provisions applicable to Title VI of the Civil Rights Act of 1964: "The procedural provisions applicable to title VI of the Civil Rights Act of 1964 apply to this part. These procedures are found in 45 CFR 80.6 through 80.10 and 45 CFR part 81." 45 C.F.R. § 84.98. Among the provisions so adopted is 45 C.F.R. § 80.7(e), captioned "Intimidatory or retaliatory acts prohibited," which provides that "[n]o recipient or other person shall intimidate, threaten, coerce, or discriminate against any individual for the purpose of interfering with any right or privilege secured by section 601 of the Act or this part, or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part."

105. The entity Defendants are recipients of federal financial assistance as pleaded in paragraphs 5, 6, and 95. They intimidated, threatened, coerced, and discriminated against Plaintiff for the purpose of interfering with rights secured by Section 504, through the conduct pleaded in paragraph 103. Unlike Count XI, this Count carries the damages remedies available under Section 504. Plaintiff seeks the economic damages pleaded in paragraph 53, nominal damages, declaratory relief, and injunctive relief, subject to the remedial limits stated in note 7. She does not seek punitive damages or damages for emotional distress on this Count.

## VI. Prayer for relief

WHEREFORE, Plaintiff prays for judgment as follows:

A. Compensatory damages in an amount to be proven at trial on each claim for which such damages are available, excluding Counts VIII and XI, on which Plaintiff seeks prospective relief only, and excluding damages for emotional distress on Counts IX, X, and XII;

B. Economic damages and nominal damages on Counts IX, X, and XII;

C. Two times actual damages on Count VI as NRS 41.1395(1) provides;

D. Punitive and exemplary damages against the individual Defendants, and against the entity Defendants where the requirements of NRS 42.007 are satisfied, on those claims for which punitive or exemplary damages are legally available, in an amount to be proven at trial;

E. A declaration, in the Court's discretion under 28 U.S.C. § 2201, of the validity, statutory characterization, and legal effect of Plaintiff's July 15, 2026 instrument, including its effect as a durable power of attorney for health care and, as pleaded in the alternative, as an advance directive for psychiatric care; of the obligations that instrument imposed on Defendants upon presentation, and of the obligations Defendants will owe upon presentation of that instrument, of Plaintiff's successor instrument, or of any materially similar instrument at a future encounter at Defendants' facilities; and that certifying its nonexistence and recording that no copy had been obtained did not discharge those obligations, with the timing and legal effect of Defendants' receipt, incorporation, indexing, routing, and availability of the instrument to be determined on the evidentiary record;

F. Injunctive relief as follows, directed to the practices Plaintiff alleges were applied to her and remain capable of being applied to her again:

(1) Under Section 504 and Section 1557, an order requiring Defendants to correct the sex designation in Plaintiff's medical record, to restore the reference ranges applicable to her laboratory results, and to transmit the correction to any recipient of the erroneous record; and

(2) Under Title III, 42 U.S.C. § 12203, Section 504, and Section 1557 as applicable to each practice, an order requiring Defendants to adopt, implement, and train personnel on policies governing the receipt, scanning, timely flagging, and clinical availability of advance directives and health care powers of attorney; the recognition of designated health care agents and their access, visitation, and statutory notification rights, including the notification NRS 433A.190(5) requires; verification that the form prescribed under NRS 433A.085 has been completed before any staff member represents to a patient that she is subject to a hold or applies a hold designation in any facility system; the provision on admission of the grievance and complaint disclosures NRS 449A.118(3) requires and the rights statement and advocacy contact information NRS 433A.350 requires; and individualized assessment before the imposition and continuation of custodial precautions, including restrictions on patient property, personal devices, and writing materials;

G. Costs of suit and litigation expenses as permitted by law, and attorney's fees and costs under NRS 41.1395(2), which provides that where recklessness, oppression, fraud or malice is established by a preponderance of the evidence, "the court shall order the person to pay the attorney's fees and costs of the person who initiated the lawsuit." A litigant who represents herself may not recover a fee for her own time, *Kay v. Ehrler*, 499 U.S. 432, 435, 437-38 (1991), and

Plaintiff therefore seeks fees for counsel's time only to the extent she retains counsel, and her costs and litigation expenses in any event;

H. Pre-judgment and post-judgment interest as permitted by law; and

I. Such other and further relief as the Court deems just and proper.

**Jury demand**

Plaintiff demands a trial by jury on all issues so triable.

DATED 23rd day of October, 2026.

Respectfully submitted,

Jade Riley Burch
Plaintiff, Pro Se